**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| UNITED STATES OF AMERICA and STATE OF NEW YORK *ex rel.* HEATH HUGHES,<br><br>                       Plaintiffs,<br><br>       -against-<br><br>INVERSE MEDICAL, LLC, VIP STARNETWORK, LLC, EMPASS HEALTHCARE, INC., and JOHONNIUSS CHEMWENO,<br><br>                    Defendants. |

Case No.:

**COMPLAINT**

JURY TRIAL DEMANDED

Relator Heath Hughes, by his attorneys, Crumiller P.C., as and for his complaint against Inverse Medical, LLC, VIP StarNETWORK, LLC ("VIPSN"), Empass Healthcare, Inc. ("Empass"; collectively, "Inverse Medical"), and Johonniuss Chemweno, respectfully alleges as follows, upon information and belief:

## PRELIMINARY STATEMENT

1. Hughes is a seasoned healthcare executive who joined Inverse Medical hoping to bring his talents and experience to bear. Instead, he was confronted with a nightmare: a company selling fictitious services, relying on fraudulent government contract applications, helmed by a mercurial CEO who openly despised gay people and fired anyone who questioned the shameless illegality of his practices.

2. Hughes observed rampant fraud by Inverse Medical – including against the state and federal governments. Indeed, government contracts appear to have formed the majority of the company's revenue, which Hughes was told was around 80 to 120 million dollars. Hughes

observed regular falsification of documents submitted by Inverse Medical in connection with these contracts.

3.      Hughes lasted only four months before he was fired, along with every other openly gay employee at Inverse Medical, shortly after making protected complaints.

4.      This action seeks to redress on behalf of the United States and the State of New York for the massive fraud that Inverse Medical perpetrated against them, and on behalf of Hughes, who suffered greatly as a result of the shocking discrimination and retaliation he experienced at Inverse Medical.


## PARTIES

5.      The United States of America and the State of New York are sovereign plaintiffs in this *qui tam* action.

6.      Relator Hughes is an individual who resides in the State of New York. He was employed by Inverse Medical from February 7 to June 2, 2022.

7.      Defendant Inverse Medical, LLC is a foreign limited liability company incorporated in New Mexico with a registered address of 477 Madison Ave, New York, NY 10022. It is a wholly owned subsidiary of Empass.

8.      Defendant VIPSN is a foreign limited liability corporation incorporated in New Mexico with a registered address of 477 Madison Ave, New York, NY 10022. It is a wholly owned subsidiary of Empass.

9.      Defendant Empass is a foreign business corporation with a registered address of 609 Greenwich St, 5th Floor, New York, NY 10014. It is a holding company, owned by Chemweno, which in turn owns the above-listed subsidiaries.

10.    Defendant Chemweno is an individual who, upon information and belief, resides in the State of New York. Chemweno is the owner of Empass and the CEO of the Inverse Medical enterprise.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction pursuant to 28 U.S.C §§ 1331, 1343, 1345, 1367, and 1343, and 31 U.S.C. §§ 3730(b), (h), and 3732.

12.    Venue is proper in the Southern District of New York pursuant to 29 U.S.C. § 1391(b)(2) as it is the judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

13.    On December 22, 2022, Hughes filed a timely Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") as to his Title VII claims.

14.    On July 14, 2023, the EEOC issued Hughes a Notice of Right to Sue. Hughes timely files this claim within 90 days thereafter.

## FACTUAL ALLEGATIONS

### I.    Inverse Medical's Checkered Past

15.    In 2012, four years after graduating from the University of New Mexico with a B.A. in political science, Chemweno founded Inverse Medical: a company selling medical equipment. Today, Chemweno owns a holding company, Empass, which owns the original LLC and several other newer subsidiaries, all of which function as a single enterprise which for years was collectively known as Inverse Medical, but more recently has pivoted to using the Empass brand.

16.    Inverse Medical's annual revenues are somewhere in the range of 80 to 120 million dollars; at the time of Hughes' employment, the entities shared approximately 30-50 employees.

17.    The different subsidiaries perform different functions. Of the entities licensed to do business in New York, Inverse Medical, LLC, is held out as a company that sells medical devices, equipment, and supplies; VIPSN is held out as a company that provides mobile and online services including vaccines, lab testing, and other in-person medical services, as well as a referral network of healthcare services. Publicly, Inverse Medical is described as having three "business units": Inverse Medical, VIPSN, and "Access Health," which is held out as a digital technology company offering an app that connects users directly with physicians to book medical appointments.

18.    When the coronavirus pandemic struck in 2020, Inverse Medical seized upon the many lucrative opportunities that became available to it. However, it became quickly apparent that the company had no regard whatsoever for ethics or safety concerns.

19.    In March 2021, a laboratory supervisor in New Mexico, Erin Bowen, observed extensive mishandling of covid testing and reporting, including samples inaccurately labeled. She observed the company improperly using mouth swabs, instead of the nasal swabs they had been certified to use for testing purposes, and saw staff being instructed to falsely label the samples.

20.    On April 8, she sent a letter to Chemweno and other management reporting her concerns. She reported that samples were being collected incorrectly, fraudulently giving test results which could not be certified as accurate, and thereby placing the entire student population and their families at risk.

21.    describing Inverse's test results as "fraudulent" and notifying Chemweno that the company was endangering the safety of its patients.

22.     Instead of addressing the serious concerns Bowen had presented, Inverse Medical management asked her who else she had told about her concerns, and threatened her for making the report. It also instructed her that she was no longer permitted to observe the testing or sample collection.

23.     Chemweno, meanwhile, lived in an alternate reality. One month after the silencing attempt, having made no efforts to address the safety issues or fraudulent test results, he published an article titled "How to Trust the COVID-19 Results from Your Laboratory," expounding on safety practices and laboratory reliability.[1] "Your laboratory is only as good as the results it produces," Chemweno blithely declared, as his company's practices continued apace.

24.     In late 2021, a batch of lawsuits was filed against Chemweno and Inverse Medical, by Bowen and others, alleging numerous, shocking violations of CDC guidelines, HIPAA, and other health and safety regulations, in the Second Judicial District Court in Bernalillo County in New Mexico.[2] These included, among other things,  test kits being stored in the break room refrigerator; false negative reports for individuals who had not actually been tested so they were cleared to work and/or fly; live covid samples being stored over regular ice packets and being sent via regular Federal Express without identification as biohazard material, and test results being sent to the wrong individual.

---

[1] Chemweno, Johonniuss, *How to Trust the COVID-19 Results from Your Laboratory*, PM360, (May 4, 2021), https://www.pm360online.com/how-to-trust-the-covid-19-results-from-your-laboratory/ (last visited Oct. 12, 2023).
[2] *Angel Gutierrez v. Inverse Medical Inc, et al,* D-202-CV-202106115; *Heather Moreno v. Inverse Medical Inc, et al.,* D-202-CV-202107146; *Tara Tedder v. Inverse Medical Inc, et al.,* D-202-CV-202106036; *Jessica Youtzy v. Inverse Medical Inc, et al.,* D-202-CV-202106114; *Erin Bowen v. VIP StarNetwork LLC, et al.*, D-202-CV-202105954.

**II.     Hughes Joins Inverse Medical In Spite of Mystery About What It Actually Does**

25.     In December 2022, Hughes applied to a Chief Operating Officer position with Inverse Medical in response to a job posting. The posting described the position as overseeing business operations involving medical devices and supplies, equipment, retail sales, comprehensive healthcare services, and an app called "Access Health" which had been unveiled in May 2021 to much fanfare as connecting users to medical providers.

26.     Hughes is a recognized operations and business development executive specializing in healthcare innovation. He holds two masters degrees, in Business Administration and Arts, and has been honored with a "40 Under 40" award and as a top 1% of US senior care providers. He has held a variety of c-suite and senior positions in the health and assisted care industries: he was the Chief Strategy Officer at Mind Hous, the Chief Strategy & Operations Officer at Assisted Care Choice, and from 2009 to 2020, he co-founded and led Senior Home Choice, a business providing assisted living and homecare services in eight locations and with more than 100 employees. He was well qualified for the position, which seemed suited for his expertise.

27.     As part of the application process, Hughes interviewed with various C-Suite executives, including Chemweno himself. However, he noticed that nobody could tell him what the company actually did or what services it actually offered. When Hughes asked, Chemweno simply responded, "let's just get you started and we'll figure the rest out as we go." The general role was equally unclear: indeed, after Hughes was offered the position, the proposed title and description of basic responsibilities were changed several times.

28.     On February 7, 2022, Hughes began his employment as the "Senior Vice President of International and Domestic Markets," where he would join Inverse Medical as the most senior

member of the business development team, reporting directly to Chemweno. The other three business development team members reported to Robert Isacco, Chemweno's Chief of Staff.

29.    Though Hughes was responsible for managing the company's sales, he could not find any information at his new job about what services he would be selling. There were no records of any past sales, nor even any sales or marketing plans. Chemweno was actively avoiding him.

30.    The company's weekly sales meeting was held the next day, which included Chemweno, Isacco, and the business development team. Hughes hoped that would be his opportunity to figure out what services the company actually provided. However, Chemweno only issued vague directives that Hughes should sell "concierge medical services" to public facilities like airlines, hotels, and sports entities, noting the company's "robust physician network" would be a key selling point. When Hughes asked what the services were, Chemweno did not elaborate, stating only that the company offers "a robust array of remote medical services for any type of event."

31.    Hughes had no idea how to respond when longer-tenured managers, including C-suite members, began asking him to explain to them what the company's services were. Literally nobody seemed to understand what "services" the company was offering, other than the covid testing and vaccinations.

32.    Hughes scheduled a meeting for February 11, 2022, with Chemweno and Isacco, Chief of Staff, in the hopes of getting answers once and for all regarding what his job entailed and what services the company was offering.

33.    Chemweno arrived an hour and a half late to the meeting Hughes had scheduled. He did not have any answers. Instead, he instructed Hughes to "create" the physician network he had been touting – thereby informing Hughes that the network did not actually exist.

34.    At that meeting, Chemweno was openly irritated by Hughes' questions. He declared that

Hughes was not ready for a C-suite position, and left after about 20 minutes.

### III.    Hughes Learns Inverse Medical is Lying and Selling Nonexistent Services

35.    Hughes soon came to learn that the reason the company was vague about its "services"

was none of them actually existed. The company provided covid testing and vaccinations, for

which it received state reimbursements – the company's primary source of revenue. There were

no "concierge medical services."

36.    Hughes also learned that the Access Health app had no functionality whatsoever. It had

no ability to schedule doctor appointments directly – its primary selling point, along with the

"robust physician network" which he had also learned did not exist. Nor were there any plans for

creating those functions, which had been touted as existing for years.

37.    Hughes was told by management that the company's projected annual revenue was 80 to

120 million dollars. It was completely unclear to him how these numbers could possibly add up

based on his observations.

38.    Hughes was soon tasked to work on several projects with Samantha Madison, the

Program and Community Development Manager, who had joined Inverse Medical the same day

as he had. Though Madison reported to the Chief Product Officer, Anne Mitchell, she and

Hughes worked together to attempt to navigate the company, lacking guidance or direction from

anyone else.

39.    In March 2022, the Biden-Harris administration launched a nationwide "Test to Treat"

initiative which provided funding to treatment facilities to offer easy, low-cost covid testing and

treatment. That month, Chemweno instructed Hughes and Madison to draft a press release

falsely announcing that Inverse Medical was part of the program, when in fact, Inverse Medical had no involvement whatsoever with it.

40.    Meanwhile, Ukraine was struggling to defend itself against Russian invasion. On March 29, 2022, Chemweno instructed Hughes and Madison to draft a press release falsely claiming that the company was engaged with an on-the ground agency in Ukraine, and that the company was ready to immediately ship an extensive list of medical supplies to Ukraine. Neither was true.

41.    Hughes and Madison were also tasked with drafting a sales pitch listing the company's capabilities and services in a bid to become an official healthcare provider for the 2022 World Cup. Chemweno instructed them to draft a proposal based on the purported "robust physician network" and other nonexistent attributes of the company. When Hughes relayed to Chemweno that there was a long and rigorous regulatory approval process, Chemweno grew irritated, replying, "there's a way around all regulations in order to make something happen," and removed Hughes from his leadership role on the project. Unbelievably, at the same time, Chemweno instructed Madison to issue a press release stating the company was *already* an official World Cup health provider. Hughes' replacement on the project informed him that Chemweno regularly continued to lie about the World Cup status at subsequent meetings.

42.    Hughes soon observed that Chemweno was as cavalier with the law as with the truth.

43.    When Madison joined Inverse Medical, she had recently worked for the New York State Executive Chamber, and as a result, was barred by Public Officers Law § 73(8)(a) for two years from "appearing or practicing" before any state agency. However, Chemweno repeatedly attempted to insist that she work directly with the State Department of Health ("DOH") on the company's covid initiatives, even after she told him she could not because it would violate the

law. When Hughes broached the subject with Chemweno, Chemweno angrily told Hughes to "stay in [his] lane."

44.    On March 31, 2022, Hughes told Madison's supervisor, Mitchell, that Madison was being subjected to a "hostile work environment" and retaliation for refusing to break the law, but nothing came of it.

### IV.    Inverse's Fraudulent Scheme to Secure Government Money and Failure to Properly Safeguard Covid Vaccines

45.    Inverse's primary source of revenue appeared to be government funding. It hosted covid vaccination events wherein the company vaccinated patients and was reimbursed by the government for doing so.

46.    Under the NY State health care provider COVID-19 vaccine distribution and implementation plan, healthcare providers were directed to engage in several steps: (1) register with an online administrator for providers through the state or city; (2) enroll in the vaccination program; (3) order, receive and administer the vaccine through the online administrator by monitoring vaccine inventory and uploading data into the online administrator. The program was funded pursuant to the Coronavirus Aid, Relief, and Economic Security Act, also known as the CARES Act, passed by Congress in March 2020.

47.    Pursuant to the CDC COVID-19 Vaccination Program Provider Agreement, as well as applicable state and federal reporting requirements, vaccination providers like Inverse Medical were required to upload various documentation substantiating the identities and the number of people who had been vaccinated as a condition precedent to receiving payment. Upon compliance with those conditions, Inverse Medical received $17,000 in government funding for each vaccination event.

48.    Inverse defrauded the government in several ways.

49.     Inverse Medical defrauded the government by uploading misleading supporting documentation to the New York State Immunization Information System ("NYSIIS") in order to secure reimbursement for vaccination events.

50.     Inverse Medical did not have the proper requisite forms to fulfill its conditions for payment under the State's healthcare provider plan. Accordingly, in order to fraudulently obtain payment, Chemweno instructed Nursing and Clinical Services Director Demerie Danielson to upload inapposite, unrelated authorization forms pertaining to unrelated services. The explicit goal was to deceive the NYSIIS computer system into counting the *number* of uploaded documents as complete, and securing the reimbursements for payment before anyone noticed that the proper forms had not been submitted. While Danielson refused to falsify the supporting materials, upon information and belief, other employees at Inverse Medical carried out Chemweno's fraudulent scheme.

51.     Chemweno was fully aware that the submissions were fraudulent. He had even attempted to reassure Danielson that the State would "never catch it."

52.     This fraudulent documentation yielded millions of dollars from the State.

53.     Finance Director Karthik Mohan also regularly falsified documents sent to the State to comply with the Company's insurance obligations, to secure and/or maintain coverage, and to various other state and private entities to obtain fraudulent reimbursement, with Chemweno's full knowledge and approval.

54.     Danielson observed that when Mohan was caught, she simply pretended the deliberate falsification had been an error.

55.     Danielson once remarked, "you have no idea how much fraud is going on here all the time."

56.     Inverse Medical also attempted to falsify the contract price in a renewal DOH contract application to fraudulently secure higher rates than it had previously been granted.

57.     In reviewing Inverse's contract renewal application, DOH representatives noticed that the numbers had been changed without justification from a prior submission and that the new numbers were false. Chemweno not only tried to justify the false numbers, but specifically lied and said that his contact "Marci" at the DOH had approved the revisions, which she had not.

58.     Inverse Medical also deliberately misclassified employees as 1099 independent contractors in order to save money on payroll, with Chemweno's knowledge and approval. Indeed, about three weeks after Hughes joined the company, Finnerty resigned her employment rather than comply with the misclassification scheme.

59.     Shockingly, Hughes also learned that Inverse Medical failed to observe basic regulations mandating the storage and maintenance of its vaccines.

60.     Inverse Medical was required to monitor and track vaccine temperature via data loggers connected to "MiFi," a type of internet hotspot, but simply didn't. As a result, there was no guarantee that the vaccines were fully safe and effective.

61.     Inverse Medical was so cavalier about its COVID vaccine storage that one employee, Fleet Supervisor Mohammed Lanre, was improperly storing COVID vaccines in his home.

62.     Chemweno was fully aware of these glaring safety violations. He didn't care.

### V.     Hughes Suffers Discrimination

63.     Hughes, a gay man, also quickly learned about rampant gender and sexual orientation discrimination at Inverse Medical, and in particular by Chemweno.

64.     On April 9, 2022, Hughes had a lengthy conversation with Fleet Operator Tremayne Rice, who was the only other openly gay man at Inverse Medical.

65.    Rice told Hughes how he had objected to various illegal behavior that Chemweno

insisted upon. Transport vehicles were unlicensed, uninsured, improperly registered, and were

missing license plates; drivers were blowing through tolls without payment in company vehicles;

fleet drivers were being misclassified as 1099 independent contractors. Chemweno had

instructed Rice to falsely register the vehicles in Connecticut, rather than in New York where

they resided, to avoid New York rates; this was itself in violation of a company loan agreement

which required its vehicles to reside in New Mexico. When Rice had objected to the legality of

all of these practices, Chemweno had simply told him that it was not illegal and that if he

wouldn't do it, someone else would.

66.    Rice also warned Hughes to "be careful" about being "out" at Inverse Medical. He told

Hughes of an earlier incident wherein Inverse Medical had refused to reject a job candidate who

had openly expressed animus at the interview toward the "homosexual lifestyle" and confided

that Chemweno was known to be homophobic.

67.    This news comported with what Hughes had observed about Chemweno's attitude toward

him. Chemweno openly avoided Hughes; indeed, he failed to attend most of their prescheduled

one-on-one meetings without explanation, prior notice or acknowledgement of any kind. In

contrast, Chemweno met daily with the three other business development employees, even as

they did not report to him directly.

68.    Chemweno rejected 14 out of the 15 different business development initiatives that

Hughes proposed, including some which were adopted by competitors with tremendous success.

In contrast, he supported the suggestions made by the others on the team.

69.    Chief Human Resources Officer (CHRO) Aly Finnerty provided Hughes with other

examples of discriminatory acts and comments by Chemweno. For example, Chemweno had

resisted providing coverage for same-sex spouses under Inverse's insurance policy, asking "why would we do *that*?" When Finnerty had mentioned her same-sex partner, Chemweno had reacted with visible disgust.

70.    Hughes also observed Inverse Medical mistreating women at the company. Finnerty told Hughes that Inverse Medical paid women less than men for equal work.

71.    Another time, Madison confided in Hughes that Chemweno fixated on her internal "Teams" photo, claiming she was showing too much cleavage, and had instructed her supervisor to demand that she change the photo - repeatedly. Madison was extremely upset and uncomfortable about the hyperfocus on her body, and specifically the unwanted and unwarranted attention on her breasts.

72.    In April 2022, at a sales meeting, Hughes was completely shocked when Chemweno openly announced to the room of employees that hiring women was a problem because "they can't stop getting pregnant."

73.    On May 4, 2022, Hughes reported to Patricia Lukas, who had replaced Finnerty as CHRO, that the company was discriminating against women. He described Chemweno's fixation on Madison's body and the "pregnant" comment and his concern that Chemweno was avoiding and marginalizing him based on his sexual orientation. Lastly, he expressed his concerns that the company was committing tax and insurance fraud.

74.    Lukas could not, and did not, deny Hughes' conclusions. Instead, she simply advised him to look for a new job to escape what she described as a "hostile work environment," and mentioned that four other employees had brought similar complaints to her attention.

75.    Upon information and belief, no investigation or remedial actions occurred. Instead, the next day, without explanation, Chemweno removed Hughes from one of his major duties

working with a design firm on a rebranding effort which had been his own idea. Chemweno went as far as to instruct other employees to remove Hughes from all meetings with the studio.

**VI.    Chemweno Fires Rice in a Fit of Homophobia**

76.    That spring, Rice successfully secured Inverse's placement as NYC Pride's official first aid provider, an opportunity that came with over $100,000 worth of free publicity. It was an extraordinary accomplishment celebrated by the whole team - except for Chemweno, who complained that Inverse Medical should be "making money off of Pride." He rewarded Rice's success by calling him "incompetent" and removing him from his leadership role in the project.

77.    The victory was short-lived: when Chemweno learned that the company was expected to decorate its service van in Pride colors for the event, he was so abject in his refusal that he instructed Danielson, to place a "clinical hold" on the event – pretending there was some legitimate medical reason the event could not proceed. Danielson told Hughes this was "a lie."

78.    On May 13, 2022, Isacco told Chemweno that Rice had raised concerns about Inverse's unlawful misregistration of vehicles and misclassification of employees. Chemweno fired Rice that same day.

79.    After firing Rice, Chemweno removed the phony clinical hold and tried to regain the opportunity, but it was too late and no longer available. Chemweno inexplicably blamed Rice and Hughes, telling multiple employees that Rice and Hughes - the company's only two openly gay employees - were somehow "conspiring" with Pride and were "out to get him."

80.    On May 16, Hughes asked Chemweno what the "real reasons" for the clinical hold, and the termination of Rice's employment, were. Chemweno dodged the question.

81.    On May 24, Hughes directly confronted Chemweno about his homophobia. He asked Chemweno point blank if he had a problem with the fact that he and Rice are gay. Chemweno did not deny it and simply changed the subject.[3]

### VII.    Chemweno Fires Madison for Complaining of Illegality, Then Fires Hughes for Complaining of Discrimination and Illegality

82.    The next day, May 25, Hughes told Isacco what Madison had reported to him about Inverse Medical submitting falsified documents to DOH.

83.    Isacco relayed this complaint to Chemweno, who fired Madison the next day.

84.    Hughes then told Isacco that firing Madison appeared to be blatantly retaliatory, and that he felt increasingly under attack as a gay man at Inverse Medical.

85.    Isacco relayed these complaints to Chemweno, whose reaction was swift. On May 31, Chemweno interrupted the regular group sales meeting out of nowhere to begin reprimanding Hughes at length for his purported mishandling of Pride and falsely blaming Hughes for the missed Pride opportunity. Chemweno's tone was so rude and scathing – and his criticism so unwarranted – that several colleagues called Hughes privately after the meeting to express their concern. The next day, Hughes told a colleague that Chemweno clearly had a problem with gay men and that he feared his firing was imminent as a result.

86.    Sure enough, the next day, June 2, Chemweno instructed Lukas and Isacco to fire Hughes, which they did. Hughes described his recent protected complaints, and asked Lukas whether the firing was retaliatory. Lukas refused to answer. Hughes later sent multiple emails to

---

[3] Upon information and belief, the next day, on May 25, Isacco suggested promoting Hughes to a C-suite position, to which Chemweno laughed and replied that Hughes out to be demoted and have his salary cut.

Lukas and Chemweno describing his belief that the firing was unlawful and retaliatory; he did not receive any response.

**VIII.  Chemweno Fires Isacco Upon Learning He Is Gay**

87.    Meanwhile, in the course of Rice's firing, it had come generally to light at the company that Isacco was also gay, and in a relationship with Rice. Indeed, Rice had confided in Hughes that Isacco was worried Chemweno would fire him if he found out he was gay.

88.    Isacco expressed this fear to Lukas as well. He emailed Lukas and Chemweno, complaining that he had been "outed," and requesting an investigation.

89.    On June 6, Lukas told Isacco that Chemweno was "annoyed" about the request. She then wrote a report which falsely accused Hughes of "outing" Isacco.

90.    On June 23, Isacco relayed information to Lukas which contradicted her report. Later that day, he received notification that he had been removed as an authorized payroll administrator. Alarmed, he called Chemweno to ask if he was being fired. Chemweno claimed that he had not removed the access and did not know why it had been removed. He was lying: he had sent an email earlier that day instructing Lukas to revoke Isacco's access.

91.    Later that day, Chemweno reprimanded Isacco at length for "stirring the pot" and asked, "how much further do you plan to take this?"

92.    On July 7, Chemweno removed Isacco's access to the company's HR files, and ignored Isacco's email asking for his access to be restored.

93.    Around this time, Lukas suddenly resigned. Discussing the resignation with Isacco, Chemweno said, "you do amazing work, Robert, and your contributions are at such a high level – but we have an ongoing investigation that needs to close." Isacco understood the threat and

agreed not to escalate the matter any further. Soon thereafter, his payroll access and HR drive access were quietly restored.

94.     However, in August, Isacco noticed a staggering increase in payments to Chemweno's wife, who was on Inverse's payroll though she did not work for the company. Her "salary" had been raised from about $90,000 to about $250,000. Isacco told Chemweno that paying salary to non-employees violated state and federal tax laws and asked him why his wife was on the payroll. Chemweno refused to answer.[4]

95.     On September 26, 2022, Chemweno fired Isacco. The letter Inverse Medical provided said that Isacco was fired for "inappropriate and hostile behavior" which included "fil[ing] a discrimination complaint with human resources."

### IX.     Fraud and Discrimination Continues Unabated at Inverse Medical

96.     With Isacco gone, Chemweno had successfully purged Inverse Medical of all employees known to be gay, as well as having fired four employees shortly after each complained about the illegality of Inverse's practices - all within six months.

97.     Hughes, Isacco, and Rice each informed Inverse Medical that it believed the terminations were unlawful and retaliatory and that they intended to vindicate their rights in court. In response, in December 2022, Inverse Medical presented Hughes, Isacco, and Rice with agreements it claimed they had electronically signed, waiving their right to pursue litigation and instead consenting to be bound to private arbitration.

98.     None of the three former employees signed those documents; one includes an inaccurate name. Suspiciously, the fake signature times are mere seconds apart from each other.

---

[4] Chemweno's housekeeper, who performed no work for Inverse Medical, was also on its payroll.

99.    The "agreements" are forgeries created by Inverse Medical in a shameless attempt to deprive its former employees of an opportunity to vindicate their rights.

100.    Though Inverse Medical continues to engage in its fraudulent practices with impunity, its actions have a major effect on others. This case seeks redress on behalf of Hughes, who suffered severe distress, including the loss of his income and a level of stress so overwhelming it caused two emergency cardiac events, requiring surgery, as well as the governments Inverse Medical defrauded.

**FIRST CAUSE OF ACTION:**
**Violation of False Claims Act (U.S.C. § 3729 *et seq.*)**

101.    Hughes repeats and realleges each allegation set forth above.

102.    Defendants knowingly presented, or caused to be presented, false and/or fraudulent claims for payment and/or approval, to the federal and state governments.

103.    Defendants knowingly made, used, and/or caused to be made or used, false records and/or statements material to a false and/or fraudulent claim.

104.    Defendants conspired to commit the actions set forth above.

105.    Defendants' actions caused the United States of America, the State of New York, and Hughes to suffer damages.

106.    The United States of America is entitled to an award of a statutory civil penalty plus three times the amount of damages it has sustained as a result of Defendants' actions.

107.    Defendants discharged, demoted, threatened, and harassed Hughes, and discriminated in the terms and conditions of his employment, because of lawful acts he took in efforts to stop the above-referenced violations.

108.    Defendants' false claims and retaliation caused Hughes to suffer emotional and

psychological distress, physical injury, mental anguish, loss of enjoyment of life, humiliation, embarrassment, pain and suffering, and economic damages.

109.    Hughes is entitled to an award of double back pay, interest on the back pay, compensatory damages, attorney's fees, and costs.

**SECOND CAUSE OF ACTION:**
**Violation of New York False Claims Act (N.Y. Finance Law § 187 *et seq.*)**

110.    Hughes repeats and realleges each allegation set forth above.

111.    Defendants knowingly presented, and/or caused to be presented, a false and/or fraudulent claim for payment and/or approval to the State of New York.

112.    Defendants knowingly made, used, and/or caused to be made or used, false records and/or statements material to a false and/or fraudulent claim.

113.    Defendants conspired to commit the actions set forth above.

114.    Defendants' actions caused the State of New York to suffer damages.

115.    The State of New York is entitled to an award of a statutory civil penalty plus three times the amount of damages it has sustained as a result of Defendants' actions.

116.    Defendants discharged, demoted, threatened, and harassed Hughes, and discriminated against him in the terms and conditions of his employment, and otherwise harmed and/or penalized him, because of his lawful acts in furtherance of his efforts to stop the aforementioned violations.

117.    Defendants' false claims and retaliation caused Hughes to suffer emotional and psychological distress, physical injury, mental anguish, loss of enjoyment of life, humiliation, embarrassment, pain and suffering, and economic damages.

118.    Hughes is entitled to an injunction to restrain continued discrimination, and an award of double back pay, interest on the back pay, compensatory damages, attorney's fees, and costs.

**THIRD CAUSE OF ACTION:**
**Retaliation in Violation of N.Y. Labor Law § 740**

119.    Hughes repeats and realleges each allegation set forth above.

120.    Hughes disclosed to his supervisor and other managerial employees, and objected to, certain activities, policies and practices of Defendants that Hughes reasonably believed violated laws, rules or regulations and/or posed a substantial and specific danger to the public health or safety.

121.    Defendants retaliated against Hughes for those protected complaints.

122.    The retaliatory actions to which Hughes was subjected could have dissuaded a reasonable employee in his position from engaging in protected whistleblower complaints.

123.    Chemweno, as CEO and Hughes' direct supervisor, is personally, directly, and individually liable as an employer for the unlawful retaliation against Hughes.

124.    Alternatively, Chemweno is personally, directly and individually liable in that he aided and abetted Inverse Medical in its unlawful retaliatory acts against Hughes.

125.    Defendants' retaliation caused Hughes to suffer emotional and psychological distress, physical injury, mental anguish, loss of enjoyment of life, humiliation, embarrassment, pain and suffering, and economic damages.

126.    Defendants' retaliation was willful, malicious, and/or wanton.

127.    Hughes is entitled to an award of economic damages, punitive damages, attorney's fees, interest, and costs.

**FOURTH CAUSE OF ACTION:**
**Discrimination in Violation of Title VII (42 U.S.C. §§ 2000e *et seq.*)**
*against Inverse Medical*

128.    Hughes repeats and realleges each allegation set forth above.

129.    Inverse Medical unlawfully discriminated against Hughes in the terms and conditions of

his employment by subjecting him to disparate treatment and terminating his employment on the basis of his sexual orientation.

130.    Inverse Medical's unlawful discrimination caused Hughes to suffer emotional and psychological distress, physical injury, mental anguish, loss of enjoyment of life, humiliation, embarrassment, pain and suffering, and economic damages.

131.    Inverse Medical willfully engaged in discriminatory practices with malice and/or reckless indifference to Hughes's federally protected rights.

132.    Hughes is entitled to an award of emotional distress damages, economic damages, punitive damages, attorney's fees, interest and costs.

**FIFTH CAUSE OF ACTION:**
**Retaliation in Violation of Title VII**
***against Inverse Medical***

133.    Hughes repeats and realleges each allegation set forth above.

134.    Inverse Medical unlawfully retaliated against Hughes for his protected discrimination complaints by subjecting him to disparate treatment and terminating his employment.

135.    The retaliatory actions to which Hughes was subjected could have dissuaded reasonable employees in his position from complaining of discrimination.

136.    Inverse Medical's unlawful retaliation caused Hughes to suffer emotional and psychological distress, physical injury, mental anguish, loss of enjoyment of life, humiliation, embarrassment, pain and suffering, and economic damages.

137.    Inverse Medical willfully engaged in discriminatory practices with malice and/or reckless indifference to Hughes's federally protected rights.

138.    Hughes is entitled to an award of emotional distress damages, economic damages, punitive damages, attorney's fees, interest, and costs.

**SIXTH CAUSE OF ACTION:**
**Discrimination in Violation of the**
**New York State Human Rights Law**
**(N.Y. Exec. Law § 290 *et seq.* ["NYSHRL"])**

139.    Hughes repeats and realleges each allegation set forth above.

140.    Defendants unlawfully discriminated against Hughes in the terms and conditions of his employment by subjecting him to disparate treatment and terminating his employment, on the basis of his sexual orientation.

141.    Chemweno, as CEO and Hughes' direct supervisor, is personally, directly, and individually liable as an employer for the unlawful discrimination against Hughes.

142.    Alternatively, Chemweno is personally, directly and individually liable in that he aided and abetted Inverse Medical in its unlawful discriminatory acts against Hughes.

143.    Defendants' unlawful discrimination against Hughes caused him to suffer emotional and psychological distress, physical injury, mental anguish, loss of enjoyment of life, humiliation, embarrassment, pain and suffering, and economic damages.

144.    The discrimination was severe.

145.    Hughes is entitled to an award of emotional distress damages, economic damages, punitive damages, attorney's fees, interest, and costs.

**SEVENTH CAUSE OF ACTION:**
**Retaliation in Violation of the NYSHRL**

146.    Hughes repeats and realleges each allegation set forth above.

147.    Defendants retaliated against Hughes for his protected discrimination complaints in violation of the NYSHRL.

148.    The retaliatory actions to which Hughes was subjected, including the termination of his employment, could have dissuaded a reasonable employee in his position from complaining of

discrimination.

149.   Chemweno, as CEO and Hughes' direct supervisor, is personally, directly, and

individually liable as an employer for the unlawful retaliation against Hughes, in violation of

NYSHRL § 296(1).

150.   Alternatively, Chemweno is personally, directly and individually liable in that he aided

and abetted Inverse Medical in its unlawful retaliatory acts against Hughes.

151.   Defendants' unlawful retaliation against Hughes caused him to suffer emotional and

psychological distress, physical injury, mental anguish, loss of enjoyment of life, humiliation,

embarrassment, pain and suffering, and economic damages.

152.   Defendants willfully engaged in discriminatory practices with malice and/or reckless

indifference to Hughes's rights.

153.   Hughes is entitled to an award of emotional distress damages, economic damages,

punitive damages, attorney's fees, interest, and costs.

### EIGHTH CAUSE OF ACTION:
### Discrimination in Violation of the
### New York City Human Rights Law
### (N.Y.C. Admin. Code § 8-101 *et seq.* ["NYCHRL"])

154.   Hughes repeats and realleges each allegation set forth above.

155.   Defendants unlawfully discriminated against Hughes in the terms and conditions of his

employment by subjecting him to disparate treatment and terminating his employment, on the

basis of his sexual orientation.

156.   Chemweno, as CEO and Hughes' direct supervisor, is personally, directly, and

individually liable as an employer for the unlawful discrimination against Hughes.

157.   Alternatively, Chemweno is personally, directly and individually liable in that he aided

and abetted Inverse Medical in its unlawful discriminatory acts against Hughes.

158.    Defendants' unlawful discrimination against Hughes caused him to suffer emotional and psychological distress, physical injury, mental anguish, loss of enjoyment of life, humiliation, embarrassment, pain and suffering, and economic damages.

159.    The discrimination was severe.

160.    Defendants willfully engaged in discriminatory practices with malice and/or reckless indifference to Hughes's rights.

161.    Hughes is entitled to an award of emotional distress damages, economic damages, punitive damages, attorney's fees, interest, and costs.

**NINTH CAUSE OF ACTION:**
**Retaliation in Violation of the NYCHRL**

162.    Hughes repeats and realleges each allegation set forth above.

163.    Defendants retaliated against Hughes for his protected discrimination complaints.

164.    The retaliatory actions to which Hughes was subjected could have dissuaded a reasonable employee in his position from complaining of discrimination.

165.    Chemweno, as CEO and Hughes' direct supervisor, is personally, directly, and individually liable as an employer for the unlawful retaliation against Hughes.

166.    Alternatively, Chemweno is personally, directly and individually liable in that he aided and abetted Inverse Medical in its unlawful retaliatory acts against Hughes.

167.    Defendants' unlawful retaliation against Hughes caused him to suffer emotional and psychological distress, physical injury, mental anguish, loss of enjoyment of life, humiliation, embarrassment, pain and suffering, and economic damages.

168.    Defendants willfully engaged in retaliatory practices with malice and/or reckless indifference to Hughes's rights.

169.    Hughes is entitled to an award of emotional distress damages, economic damages,

punitive damages, attorney's fees, interest, and costs.

## DEMAND FOR RELIEF

WHEREFORE, it is respectfully requested that the Court enter judgment, in an amount to be determined by the trier of fact, as follows:

1) on the First Cause of Action, awarding to the United States of America the maximum civil penalty allowed by law and treble damages, and to Hughes double back pay, interest on the back pay, compensatory damages, attorney's fees, and costs, as against all Defendants;

2) on the Second Cause of Action, awarding to the State of New York the maximum civil penalty allowed by law and treble damages, and to Hughes an injunction to restrain continued discrimination and an award of double back pay, interest on the back pay, compensatory damages, attorney's fees, and costs, as against all Defendants;

3) on the Third Cause of Action, awarding to Hughes economic damages, punitive damages, attorney's fees, and costs, as against all Defendants;

4) on the Fourth and Fifth Causes of Action, awarding to Hughes emotional distress damages, compensatory damages, economic damages, punitive damages, attorney's fees, and costs, as against Inverse Medical;

5) On the Sixth, Seventh, Eighth, and Ninth Causes of Action, awarding to Hughes emotional distress damages, compensatory damages, economic damages, punitive damages, attorney's fees, and costs, as against all Defendants; and

6) granting such other relief as may be just.

## DEMAND FOR TRIAL BY JURY

Pursuant to FRCP § 38(b), Hughes demands a trial by jury.

Dated: Brooklyn, New York
       October 12, 2023

Respectfully submitted,

Susan Crumiller
Crumiller P.C.
16 Court St, Ste 2500
Brooklyn, NY 11241
(212) 390-8480
susan@crumiller.com
Attorneys for Relator Heath Hughes